IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---

4600 King Street, LLC,

        Plaintiff,

-against-

Kimco Realty Corporation,

        Defendant.

**JURY TRIAL DEMANDED**

Civil Action No. 1:23-cv-00059

---

## COMPLAINT

Plaintiff 4600 King Street, LLC ("Abramson" or "Plaintiff"), by and through its undersigned counsel, hereby submits this Complaint against Defendant Kimco Realty Corporation ("Kimco" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. This action arises from Kimco's attempt—following its merger with Weingarten Realty Investors ("WRI")—to keep for itself certain anticipated profits that it must rightfully share with the Plaintiff here.

2. Daniel and Paul Abramson—two brothers who are the sole members of Plaintiff—are pillars of the real estate community in Alexandria, Virginia, and they have worked tirelessly for the better part of a decade to bring to fruition a massive, multi-hundred-million-dollar development project located in Alexandria, Virginia (the "West Alex Project" or the "Project") that would bring much-needed retail and residential opportunities to the City of Alexandria.

3. Not only would this Project benefit the community, but it was expected to be hugely profitable. After years of laying the groundwork for the Project through planning, zoning

approvals, and the like, in 2015 Plaintiff Abramson found a financial partner—WRI—with the experience and wherewithal to bring Abramson's vision for the West Alex Project to life. In connection with agreeing to develop the Project, WRI agreed to compensate Abramson both for their work undertaken up to that point as well as the additional work—including obtaining necessary Project approvals and navigating the Alexandria bureaucracy—that Abramson was anticipated to perform going forward. While Abramson certainly sought compensation, they were willing to defer much of their compensation until the Project was complete. Accordingly, the parties entered into a Net Profits Agreement (the "NPA" or "Agreement") whereby, in exchange for Abramson assigning their contract to purchase the underlying property for the Project to WRI, WRI agreed that Abramson would receive a payout of the net profits from the finished project. Because WRI was not in the business of owning residential property, the parties understood and expressly stated in writing that WRI would sell the residential piece of the development once it was completed and stabilized, thereby providing a predictable monetization event for Abramson upon the Project's completion.

4. The working relationship between Abramson and WRI was productive, and the Project moved steadily along toward completion over the following years. All the while, WRI was transparent with Abramson about the status of the Project, providing Abramson with detailed information regarding the financial metrics of the Project to enable Abramson to reasonably calculate the expected net profits once the Project was completed and stabilized.

5. However, what had been a harmonious partnership for Abramson turned sour in July 2021, when Defendant Kimco merged with WRI and acquired WRI's assets—including the West Alex property at issue here. Kimco openly touted the value of West Alex Project to shareholders following the merger—including calling it a "crown jewel" of the WRI portfolio—

but it apparently realized that the more successful West Alex was, the more they would have to compensate Abramson.  Upon information and belief, around the time they completed the WRI acquisition, Kimco internally embarked on a scheme to corrupt the monetization process contemplated by the NPA and thereby prevent Abramson from earning the profits they were due.

6. In late October 2021, shortly after acquiring WRI and the property, Kimco triggered the appraisal process provided for under Section 7 of the NPA.  Under this Section, Abramson and Kimco each selected an appraiser to evaluate the property to determine its fair market value.  As set forth in the NPA, the appraisers were to determine the value of the property based upon "if the Project were sold for its [fair market value]."

7. Yet Kimco corrupted that process by selecting an appraiser that was not "independent" as required by the NPA and then, upon information and belief, convincing that appraiser to deflate its projections of the fair market value of the property based on a COVID doom-and-gloom scenario, all while continuing to publicly tout its optimism for the prospects of the West Alex Project to bolster Kimco's share price among investors.

8. As a result of Kimco's concerted efforts to taint the appraisal process by both selecting a conflicted appraiser and feeding that appraiser false information, Kimco obtained its lowball appraisal.  However, Abramson's appraiser accurately valued the property at its fair market value.  Under the NPA, when a third appraiser was selected to pick which of the two appraiser's values would govern and apply for purposes of calculating the interest in net profits due to Abramson, the third appraiser selected Kimco's appraiser's lowball value.  That third appraiser relied upon the false information in Kimco's appraiser's report, and upon information and belief, may have likewise been fed false information directly from Kimco's appraiser.

9.      Abramson has thus been left with none of the interest in the net profits he contends he would have received under an accurate and independent appraisal process, as expressly contemplated in the NPA.  By Abramson's calculations, this amount would have been upwards of $6 million dollars had the property been properly appraised.  As such, this lawsuit is necessary to provide redress for Kimco's clear breach of the NPA, which has caused and continues to cause Abramson harm.

## PARTIES

10.      Plaintiff 4600 King Street, LLC ("Abramson") is a limited liability corporation organized and existing pursuant to the laws of the State of Virginia, having its principal place of business at 507 Wythe Street, Alexandria, Virginia 22314.  4600 King Street, LLC has two members:  Daniel and Paul Abramson, both of whom who are domiciled in Alexandria, Virginia.  In 1982, Daniel and Paul Abramson founded their company Abramson Properties, which acquires property, works to obtain approvals from local governments, arranges project financing, and oversees the development and construction of their projects.

11.     Daniel Abramson has lived and worked in Alexandria, Virginia, for more than 50 years.  Among other things, Daniel Abramson has chaired the Board of Directors of the Alexandria Housing Development Corp ("AHDC"), the City of Alexandria's non-profit affordable housing entity, since AHDC was established by the Alexandria City Council in 2004.

12.     Likewise, Paul Abramson has lived and worked in Alexandria, Virginia, for more than 50 years.  Among other things, Paul Abramson has served as board chairman of the Alexandria Transit Company, which oversaw the operations of the City DASH bus system and its 90 buses.

13.     Defendant Kimco Realty Corporation ("Kimco") is a Maryland corporation with a principal place of business at 500 North Broadway, Suite 201, Jericho, New York 11753.  Kimco

is a real instate investment trust that, according to its own website, "is North America's largest publicly traded owner and operator of open-air, grocery-anchored shopping centers, including mixed-use assets." Kimco has been publicly traded on the New York Stock Exchange since 1991, and is included in the S&P 500 index. And as of September 30, 2022, "the company owned interests in 526 U.S. shopping centers and mixed-use assets comprising 91 million square feet of gross leasable space."

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

**A. Daniel and Paul Abramson.**

16. Daniel and Paul Abramson, the two members of Plaintiff 4600 King Street, LLC, are prominent and well-respected members of the Alexandria, Virginia real estate community.

17. In 2013, Daniel and Paul Abramson formed 4600 King Street, LLC, for the purpose of purchasing and developing the Gateway Project at the five-plus acres located at King and Beauregard Streets in Alexandria, Virginia.

18. In 1982, Daniel and Paul Abramson continued in their family tradition of residential building when they founded their company Abramson Properties, which acquires property, works to obtain approvals from local governments, arranges project financing, and oversees the development and construction of their projects.

19. In addition to their work at Abramson Partners, Daniel and Paul Abramson are active participants in the broader Alexandria, Virginia real estate community.

20. Among other things, Daniel Abramson has chaired the Board of Directors of the Alexandria Housing Development Corp ("AHDC"), the City of Alexandria's non-profit affordable housing entity, since AHDC was established by the Alexandria City Council in 2004. He also is the Chair of the Board of Directors of the University of Virginia Foundation, which owns a majority of the real estate assets of the University.

21. Likewise, Paul Abramson has served as board chairman of the Alexandria Transit Company, which oversees the operations of the City DASH bus system and its 90 buses.

**B. Initial Development of the West Alex Property.**

22. On or about January 28, 2010, Abramson began work on a large-scale real estate venture located at 3445 Berkeley Street in Alexandria Virginia. The West Alex Project (previously known as the Gateway Project) was complex—designed to be a mixed residential and non-residential property that would provide much needed market and affordable housing, retail space, office space, parking, and public transit for members of the community.

23. Given the mixed-use nature of the West Alex Project, Abramson worked with various consultants over a period of five years to ensure the City of Alexandria would grant zoning approval for the Project. For instance, Abramson worked with traffic consultants to make the Project a transportation hub, after which the Project was designated by the City of Alexandria as a Transit Oriented Project. Abramson brought in Harris Teeter as a grocery anchor tenant, negotiating the agreement for the largest urban mixed-use Harris Teeter grocery store (62,000 square feet) in the Country. And Abramson was also fundamental in bringing in Whiting Turner

6

for pre-construction and general contractor services, working to develop a favorable construction budget.

24. On November 14, 2015, the City of Alexandria's Planning Commission and City Council unanimously approved the Project.

25. Abramson's well-established connections in the City of Alexandria real estate community were crucial to the success of the Project in these early days. For example, Daniel Abramson's position at AHDC and personal advocacy for the West Alex Project were essential to the City Council's zoning and entitlement approvals for the Project in 2015. Likewise, Paul Abramson's role as board chairman of the Alexandria Transit Company allowed him to be an important conduit with the City of Alexandria's Department of Transportation and Environmental Services for transportation design assistance and utility services. Their positions further enhanced Abramson's credibility as capable and responsible developers with the City of Alexandria.

26. Without Abramson's dedication to this Project in the early days, the Project would never have gotten off the ground.

**C. Abramson Taps WRI To Serve As Financial Partner and Developer.**

27. Following zoning approval, Abramson sought a financing or financial partner to develop the Project. After soliciting a number of proposals, Abramson selected non-party Weingarten Realty Investors ("WRI"), based in Houston, Texas, and a New York Stock Exchange listed real estate company. At the time, WRI owned approximately 150 grocery-anchored shopping centers around the country and was looking to expand into the Washington, D.C. metro area. On November 16, 2015, Abramson and WRI entered into a Letter of Intent for a joint venture.

28. Because WRI did not own any residential properties and had no residential experience, WRI's strategy was to develop the Project and sell off all non-retail components when stabilized, especially the apartment building. It was in part because of this strategy that Abramson

7

selected WRI as its partner for the Project in the first place. Indeed, it was the assumption of the whole development team for the Project (including both Abramson and WRI) that the Project would be constructed and the non-commercial components sold once stabilized.

29. From 2015 forward, Abramson worked tirelessly to bring the Project to fruition. Abramson remained very active during the construction phase, addressing myriad issues that arose, assisting WRI's representatives on site, and serving as a conduit for communications with the City.

30. On October 16, 2016, Abramson and WRI entered into a Net Profits Agreement. The NPA was designed to compensate Abramson for creating the opportunity to purchase the property upon which the Project was to be built, obtaining the entitlements for the Project, as well as providing their essential services during the development. Under the terms of the NPA, Abramson agreed to assign, transform, and convey certain right to purchase the property for the Project to WRI so that WRI could continue the development of the Project. In exchange, WRI agreed to provide Abramson with certain payments and an interest in the net profits realized upon the occurrence of certain events, including the sale of all or any portion of the Project. Attached hereto as Exhibit A is a true and correct copy of the Net Profits Agreement.

31. Both Abramson and WRI understood that Abramson would receive net profits pursuant to the NPA upon the contemplated sale of the residential property within the Project. Indeed, and as discovery will confirm, that assumption was the principal basis for the structure and payment waterfall provided for by the NPA. Had Abramson any expectation that the financial partner chosen for the Project intended to keep the non-commercial investment, Abramson would have insisted on a different form of agreement.

**D. The Net Profits Agreement.**

32. The NPA provided a particular process for calculating the interest in Net Profits Abramson would eventually receive. In the NPA, "Net Profits" was defined to mean "all cash

receipts received by Weingarten or by any Affiliate of Weingarten on behalf or for the account of Weingarten or such Affiliate, from the operations of the Project or a Capital Event," other than certain exclusions and subtracting certain necessary cash expenses and payments. A "Capital Event" was defined to include "the financing or refinancing or sale, condemnation or casualty with regard to all or any portion of the Project."

33. Pursuant to the terms of the NPA, either party had the right to cause WRI to payout the interest in Net Profits granted to Abramson following the fifth anniversary of the date upon which WRI closed on the purchase of the land as contemplated in the NPA and a related purchase agreement. Under such circumstances, the NPA provided that WRI "shall calculate the amount of such Payout . . . the same being equal to the aggregate payments that Abramson would receive . . . if the Project were sold for its Value." *See* NPA, § 7(a). As further stated in the NPA, "[f]or purposes hereof the 'Value' of the Project shall be the value of the remaining Components comprising the Project then held by Weingarten other than any such Components that are under contract to be sold to one or more third parties (collectively, the "Remaining Components") . . . ." *Id.* The term "Value" was defined as "fair market value" in the NPA. *Id.*, § 7(d).

34. The assumption within this Section was that WRI was a willing seller, working to maximize profits in the event of an eventual sale.

35. Under the NPA, Section 7(d) provided that "[t]o the extent that the fair market value . . . must be determined for purposes of Section 7(a) hereof and the parties have not otherwise agreed upon such Value" within a select time period, the parties would elect a single "reputable, nationally recognized, independent third party appraiser (a 'Qualified Appraiser') to determine the Value of the Remaining Components." *See* NPA, § 7(d). In the event the parties could not agree on a single Qualified Appraiser, each party would elect its own Qualified Appraiser. If the

difference between the appraisals was greater than five percent (5%) of the greater of the two appraisals, then the Qualified Appraisers would select "in good faith" a third Qualified Appraiser who would "select which of the two Appraisals more accurately represents the Value of Remaining Components and the Appraisal so selected by such third Qualified Appraiser shall be the Appraisal used for purposes of determining the Value of such Remaining Components hereunder." *Id.* The NPA further provides that the "cost of any third Qualified Appraiser selected by the initial two Qualified Appraisers shall be borne by the party whose designated Qualified Appraiser prepared the Appraisal that such third Qualified Appraiser did not select." *Id.*

36. In addition to an entitlement to the interest in Net Profits, the NPA further provided that Abramson would receive certain cash advances, which would be capped at $480,000.

**D. Abramson Continues to Play a Vital Role in the West Alex Project.**

37. Following the execution of the NPA, Abramson continued to play an integral role in facilitating the development of the Project.

38. Among other things, Abramson continued to use their position in the community and their strategic relationships with the mayor, City Council, and city staff to obtain necessary approvals for the Project and to keep the inspections and satisfaction of on-site requirements on track. Abramson attended weekly owner-architect-contractor on-site meetings and also attended regular WRI management calls regarding the Project. At both, Abramson provided advice and solutions to problems, as well as facilitated meetings and communications with key Alexandria officials. The parties were well aware that no other persons or entities could have performed these diverse, vital services as effectively or efficiently as Abramson. The NPA was designed to compensate Abramson for these efforts as part of a post-stabilization sale.

### E. Kimco Realty Corporation Merges With WRI.

39. In April 2021, Defendant Kimco announced that it would be merging with WRI in an approximately $3.87 billion cash and stock deal. Upon and after closing the deal in July 2021, Kimco executives publicly touted the importance of three specific developments in the WRI portfolio, including the West Alex property, as reasons for optimism and projected future growth. For example, in a presentation accompanying Kimco's Q3 2021 earnings call, Kimco pointed investors to "NOI Growth Through a Curated Collection of Mixed-Use Projects and Redevelopments," alongside a picture of West Alex and two other WRI projects. Similarly, on Kimco's Q4 Earnings call, Kimco CEO Conor Flynn attributed Kimco's positive fourth quarter results to the fact that "the Weingarten portfolio exceeded all of our underwriting assumptions."

40. Moreover, in its SEC filing associated with the merger, Kimco described West Alex as its premier project and as justification for paying billions of dollars to acquire the Weingarten assets in the merger.

41. However, upon information and belief, Kimco realized upon purchasing the West Alex property that the Project's success meant Kimco would owe a bigger payout to Abramson under the terms of the NPA. As such, Kimco began plotting to figure out a way to avoid having to pay Abramson the significant profits they were expecting and entitled to under the terms of the NPA.

42. Upon information and belief, Kimco began acting to take advantage of the transient adverse impacts of the COVID-19 pandemic upon income and expenses of the West Alex property to depress its value. Moreover, Kimco likely realized the City of Alexandria's tax assessment of the West Alex property was likely to rise substantially following the property's completion, and it knew that if a third-party appraisal purportedly supporting a much lower valuation could help it appeal any proposed increase in that assessment.

**F. Kimco Triggers the Appraisal Process Under the Net Profits Agreement.**

43. In October 2021, Kimco, now counterparty to the NPA in place of WRI, triggered the appraisal process contained in the NPA pursuant to Section 7(d). Kimco and Abramson did not select one appraiser to determine the fair market value of the property, but rather Kimco and Abramson each selected their own appraiser in accordance with the procedure set forth in Section 7. Under the terms of the NPA, the appraiser selected needed to meet the definition of "Qualified Appraiser": a "reputable, nationally recognized, independent third party appraiser." *See* NPA, Section 7(d).

44. Abramson hired Stuart Smith to conduct its appraisal. Smith completed his appraisal report on March 22, 2022 (hereinafter the "Smith Report"). Attached hereto as Exhibit B is a true and correct copy of the Smith Report.

45. As set forth at length in the Smith Report, Smith has over 40 years of real property valuation experience, and is dedicated to providing unbiased, third-party market value appraisals. Smith Report, Smith Resume. Importantly, Abramson had never worked with Smith before and had no prior connection to Smith. Smith, in other words, met the definition of a "Qualified Appraiser" pursuant to the NPA.

46. In the Smith Report, Smith concluded that as of February 5, 2022, the total asset value of the West Alex Property was $238,600,000.

47. Kimco selected CBRE to conduct its appraisal. However, CBRE did not meet the definition of "Qualified Appraiser" under the terms of the NPA. In fact, CBRE has represented Kimco in a number of real estate transactions in recent years, including in the sale of a $21 million shopping center in Oakbrook Terrace, Illinois in 2019 and in the sale of two California warehouses for $108 million in 2021. Abramson anticipates that discovery into the relationship between CBRE

and Kimco would likely reveal further connections and would also reveal whether future engagements were tied, either explicitly or implicitly, to CBRE's appraisal work in this matter.

48.     CBRE issued its report on March 22, 2022 (hereinafter, the "CBRE Report"). Attached hereto as Exhibit C is a true and correct copy of CBRE Report.

49.     In the CBRE Report, CBRE concluded that as of March 1, 2022, the market value of the West Alex Property was $187,100,000. That value was plainly "made as instructed"—in its negotiations with Abramson prior to the appraisal process, Kimco had told Abramson that its internal underwriter (who is not an appraiser) suggested the value of the property was $187 million. That Kimco's supposed "independent" appraiser came up with the identical value suggests that Kimco placed a heavy thumb on the scale of CBRE's process.

50.     Upon information and belief, Kimco tainted the appraisal process by presenting CBRE with a "doom-and-gloom" narrative of the Project, all while publicly expressing the future potential profit growth from the Project to its investors and to the SEC. Among other things, Abramson understands that Kimco apparently claimed that COVID rent concessions would continue, as would COVID-elevated operating expenses, marketing expenses, and other capital expenses, despite clear market indications of increased rent and decreased actual stabilized operating expenses. Upon information and belief, all of these factors artificially depressed the Net Operating Income ("NOI") used in the CBRE Report.

51.     Abramson anticipates that discovery will also reveal that Kimco's internal models showed a much stronger view of West Alex's prospects. In fact, in January 2022 Kimco unequivocally stated that it would not sell West Alex for $187 million, a clear concession that CBRE's appraisal ultimately undervalued the Project, particularly since the NPA required the valuation to be as if Kimco were a willing seller.

52. Upon information and belief, the CBRE Report reveals that CBRE's approach contained abnormalities. Through an analysis of the comparable properties relied upon by each of the three appraisers, Abramson has found that CBRE's approach is inconsistent with appraisals of these types of properties that were otherwise being conducted during these periods of time.

53. Ultimately, the flaws in the appraisal process orchestrated by Kimco were further made obvious by the absurdity of CBRE's final conclusion: that a project meeting or exceeding its development metrics could somehow be worth less than the cost basis that WRI had assigned to it six months prior to the date of the appraisal and that it could be worth far less than the replacement cost of the development. While WRI's Q2 2021 securities filings provided a development cost of $200 million for West Alex, Kimco's 2021 10-K ascribed a cost basis to West Alex of just under $155 million. Upon information and belief, Kimco has provided no explanation for the nearly 25% drop in cost basis for the Project, though Abramson anticipates that discovery will likely reveal whether there were any independent improprieties with respect to that calculation.

54. As the difference in the values of the Smith Report and the CBRE Report was greater than five percent (5%) of the greater of the two appraisals, under Section 7(d) of the NPA, a third Qualified Appraiser was to be hired to select which of the two appraisals—the Smith Report or the CBRE Report—would govern. The parties' appraisers selected Thomas J. Shields, MAI, of Joseph J. Blake and Associates, Inc. as the third Qualified Appraiser.

55. On June 23, 2022, Shields issued a letter stating that his conclusion that between the Smith Report and the CBRE Report, the CBRE Report "more accurately reflects the market value of the subject property." Attached hereto as Exhibit D is a true and correct copy of the Letter dated June 23, 2022, from Thomas Shields.

56. Upon information and belief, when conducting his own opinion of value, Shields relied upon the same misinformation Kimco provided to CBRE. Moreover, upon information and belief, Kimco further tainted the appraisal process when its appraiser CBRE spoke with Shields without Abramson's appraiser, Smith, present for the conversation. Under the terms of the engagement agreement with Shields, Shields was not supposed to speak with CBRE or with Smith without the other appraiser present. Abramson does not know what was discussed during that call where Abramson's own appraiser was not present. That this happened in the first place only further reveals Kimco's desire to obstruct what should have been an independent appraisal process.

57. Compounding this harm was Shields' own failure to comply with the Uniform Standards of Professional Appraisal Practice. For example, Shields unreasonably relied on an erroneous assumption that the "per door" price of the residential building at West Alex (The Array) was higher than comparable sales. The apartments at The Array are larger than the comparables used by Shields. The average at the Array is 925 sq. ft. Mr. Shields used comps of 860 sq. ft. Using a square foot value, the Array and the comps are at $61/62 per square foot. (Array door $568,344 ÷ 925 psf = $61 psf; Comps $535,000 per door ÷ 860 psf = $62 psf.)

58. Accordingly, upon information and belief, Shields ultimately selected the CBRE Report over the Smith Report based upon inaccurate information largely fed to him by Kimco and CBRE.

**G. Kimco's Actions Cause Significant Harm to Abramson.**

59. As a result of selecting the CBRE Report, the West Alex property was determined to be valued at $187,100,000. But Abramson contends that this valuation is completely inaccurate, given all other indications about the value of the property—including to but not limited to the valuation in the Smith Report.

60. As a practical result of this corrupted process, Abramson was entitled to no payout whatsoever under the terms of the NPA—despite the key role Abramson played in developing the Project from beginning to end. Kimco has, at bottom, acted to frustrate the benefit of the bargain Abramson struck with WRI through the NPA.

61. Had Kimco not acted to undermine the appraisal process, Abramson believes, based on the information available, that they would have received over $6 million dollars as the payout under the terms of the NPA.

62. Following Shield's selection of the CBRE Report, Abramson contacted Shields in an attempt to obtain his file on the matter in an effort to vindicate their rights and receive the payout they deserved—and would have been entitled to under an actually independent and proper third-party appraisal process like that conducted by Abramson's appraiser Smith. Kimco at first resisted the disclosure of his working papers, then relented. However, Shields did not produce all the records requested.

63. Not only did Kimco taint the appraisal process, but to add insult to injury, on August 3, 2022, Kimco wrote Abramson a letter demanding Abramson pay Kimco the $480,000 in advanced fees Abramson had received from WRI pursuant to the terms of the NPA and which would be credited against Abramson's Net Profits, expected to be millions of dollars. Kimco claimed Abramson needed to repay these fees as a result of Shields selecting the CBRE Report over the Smith Report. Apparently so concerned that Abramson would try to vindicate their rights, Kimco engaged in scare tactics—threatening to come after Abramson. Thus, Kimco's assertion is that Abramson would get absolutely no compensation—no benefit of their bargain—for all of their efforts and valuable benefits conferred upon WRI and Kimco.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

64. Abramson hereby incorporates each and every allegation contained in the previous Paragraphs as if each was fully set forth at length herein.

65. The NPA is a valid and enforceable agreement.

66. Kimco has breached its obligations under the NPA by selecting a non-independent appraiser, CBRE, contrary to the requirements in Section 7(d) that Kimco select a "Qualified Appraiser."

67. Abramson has performed all obligations owed to Kimco pursuant to the terms of the NPA.

68. As a direct and proximate result of Kimco's willful breach of the NPA, Abramson has been made to suffer damages in an amount to be determined at trial which, upon information and belief, exceeds $6 million dollars.

## SECOND CAUSE OF ACTION
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

69. Abramson hereby incorporates each and every allegation contained in the previous Paragraphs as if each was fully set forth at length herein.

70. The NPA is a valid and enforceable agreement.

71. The NPA contains an implied covenant of good faith and fair dealing to which the parties must adhere in performing their contractual duties. Specifically, the NPA contained an implied covenant by Kimco that it would not corrupt the appraisal process by feeding the appraiser false information in an effort to ensure the appraiser's report would contain a depressed value.

72. As set forth above, Kimco breached the implied covenant of good faith and fair dealing by corrupting the independent process contemplated in the NPA when it fed its non-

17

independent appraiser false information to ensure the appraiser would significantly undervalue the property at Abramson's expense.

73. Even if Kimco was permitted to select CBRE, the *information* Kimco subsequently conveyed regarding the West Alex property was done so in bad faith. Kimco tainted the appraisal process with a doom-and gloom scenario of continuing COVID-related costs and rent concessions all while telling the investing public a far more optimistic story of anticipated NOI improvement. Kimco's actions can only be understood when appreciating they had the motive: to manufacture a low appraisal value in order to avoid paying Abramson the interest in net profits they were owed.

74. Abramson has performed all of the conditions, covenants, and promises owed to Kimco as required by the NPA.

75. As a direct and proximate result of Kimco's willful breach of the implied covenant of good faith and fair dealing, Abramson has been made to suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## (UNJUST ENRICHMENT)

76. Abramson hereby incorporates each and every allegation contained in the previous Paragraphs as if each was fully set forth at length herein.

77. Abramson's significant efforts to initiate the West Alex Project, negotiate and secure a contract to purchase the property for the project, ensure that the necessary approvals were obtained, secure a financial partner in WRI, and shepherd the West Alex Project through to completion conferred a benefit on Kimco. Today, as a direct result of Abramson's efforts, Kimco has been unjustly enriched: Kimco now has as one of its assets the valuable and profitable West Alex property yet has given Abramson nothing in return.

78. Kimco is aware that Abramson conferred this benefit. Indeed, the NPA was expressly designed to compensate Abramson for their crucial work in the West Alex Project by awarding an interest in net profits once the Project was completed. Moreover, Kimco has publicly referred to the West Alex property as a "crown jewel" of the WRI portfolio—revealing Kimco understands the value of this asset.

79. After manipulating the valuation process contemplated in the NPA, Kimco now contends Abramson is entitled to *zero dollars* for their tireless work, without which Kimco would not even have the profitable West Alex property in its portfolio.

80. It would be inequitable and against good conscience for Kimco to retain this benefit without paying Abramson a single dollar to compensate them for the value of their significant contributions to the West Alex Project.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as against Defendant as follows:

a) Awarding Abramson damages in an amount to be determined at trial, including (i) damages arising out of Kimco's willful breach of the NPA and (ii) damages arising out of Kimco's willful breach of the implied covenant of good faith and fair dealing within the NPA;

b) In the alternative, awarding Abramson damages, in an amount to be determined at trial, to compensate Abramson for the benefit they conferred on Kimco through their work on the West Alex Project;

c) Awarding Abramson attorneys' fees and costs incurred in prosecuting this action; and

d) Granting Abramson such other and further relief as this Court deems just and appropriate.

Plaintiff demands a jury trial for all issues so triable.

Dated: January 12, 2023                                  Respectfully submitted,

                                                      GIBSON, DUNN & CRUTCHER LLP


By: */s/ Joseph D. West*
    Joseph D. West (VA. State Bar No. 16834)

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
JWest@gibsondunn.com


Mary Beth Maloney (*pro hac vice* application pending)
Nathan C. Strauss (*pro hac vice* application pending)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
MMaloney@gibsondunn.com
NStrauss@gibsondunn.com


*Counsel for Plaintiff 4600 King Street, LLC*